### H. N. Kirkpatrick, *et al.*, v. G. W. Vickers, *et al.*

Two Election Boards; *Which, Legal.* At a city election in a city of the third class, where the regular judges of the election fail to attend or refuse to act, and two election boards are elected by the bystanders at different times, but both are elected before 8 o'clock in the morning, *held*, that both are elected prematurely; but, that the one last elected and last organized before 8 o'clock in the morning, (a majority of the electors present at the election and organization participating therein,) will be deemed to be the legal board, unless something else transpires to render it illegal; and further, *held*, under the circumstances of this case, that the board last elected and last organized was the legal board.

#### Original Proceedings in Mandamus.

April 14th, 1880, an alternative writ of mandamus was issued out of this court, upon a petition filed therefor by *H. N. Kirkpatrick* and five others, who claim to have been elected officers of the city of Anthony, in the county of Harper, at an election held in that city on April 5th, 1880, and directed to *G. W. Vickers* and four others, as members of the council of that city, and to *G. W. Maffett*, as the city clerk thereof, commanding them, on the 24th day of April, 1880, to meet at the council room in said city, and then and there to count the entire vote cast at said election, and to declare the true result thereof, or to show cause, etc. May 14th,

1880, the defendants answered, and made a return to the writ that they had obeyed the command thereof, but the plaintiffs controverted the truth of this return. Other facts are stated in the opinion, filed herein November 9th, 1880.

*Davis & Jetmore,* for plaintiffs.

*Grove & Shepard,* for defendants.

The opinion of the court was delivered by

VALENTINE, J.: This is an action of mandamus brought originally in this court by H. N. Kirkpatrick and others, who claim to have been elected officers of the city of Anthony, (a city of the third class,) at an election held in said city on April 5, 1880, to compel the defendants, G. W. Vickers and others, who are the city councilmen and the board of canvassers of that city, to canvass the returns of said election. An alternative writ of mandamus has been issued in the case, and the defendants make return thereto that they have obeyed the mandate thereof by canvassing the said election returns. The plaintiffs controvert the truth of this return, and the only question in the case is, whether the return is true or not; that is, have the defendants in fact canvassed said election returns? It appears from the pleadings and evidence that at said election in said city, two election polls (instead of one) were opened, that at each of which votes were received, that returns from each were duly made to the city clerk, that the defendants, as a board of canvassers, at first refused to canvass either set of said returns, but afterward, and in assumed compliance with the mandate of this court, canvassed one set of said returns, and refused to canvass the other set. The plaintiffs claim that the returns which the board canvassed were not the returns of the legal election held in said city, but that the returns which the board refused to canvass were such legal returns. The only question then for us to determine is, which of said two elections was legal? Or rather, was the election, the returns of which the board refused to canvass, legal? For if said last-

mentioned election was not legal, then we must decide this case in favor of the defendants, whether the other election is valid or not, for the plaintiffs in this case found their entire cause of action upon the election, the returns of which the board refused to canvass.

Both elections were held at the same time and in the same building — the county court house. This court house is a small one-story building with two rooms, and a board partition between the rooms, and a door and one or two scuttle-holes in such partition, giving access from one room to the other. This is the place where elections were generally held, and where the people universally understood that they were to be held. The elections, however, were generally held in the south room of said court house. The city council had also previously passed an ordinance that the elections should be held at the police judge's office, and by using the words "police judge's office," they meant the south room of said court house, but the police judge never in fact held his office at the court house, and never in fact did any business there, but in fact did all his business as police judge at his own private office, about four hundred yards distant from the court house. At about 7 o'clock in the morning of the first Monday in April, (April 5,) 1880, the day on which the city election was to be held, the voters of the city of Anthony commenced to congregate at said court house, for the purpose of holding their city election. The councilmen who had been designated by the mayor and council to serve as judges of the election, failing to attend, or refusing to act, the by-standers proceeded to elect judges for such election, and these judges appointed the clerks. This was all done before 8 o'clock. About ten or fifteen voters participated in this organization. Very soon afterward, and about 15 minutes before 8 o'clock, other electors having arrived, and being dissatisfied with said organization, a second organization was perfected. A full set of judges was elected for this second board, and a full set of clerks appointed — all according to law, provided the electors present then had the power to

organize an election board. There were about twenty or twenty-five electors who took part in this second organization, and this organization was perfected before 8 o'clock of the morning of the election. Both organizations were effected in the south room of said court house. As soon as the second board was organized, it went into the north room of the court house and received votes through a scuttle-hole in said board partition — the voters standing in the south room. The first board remained in the south room and there received votes. Twenty-nine votes were received by the first board, and fifty-one by the second. It does not appear that any illegal vote was polled at either place, or that any elector voted more than once. There were about ninety-five legal voters residing at that time in the city of Anthony.

Upon the foregoing facts, we are of the opinion that the second board (the board last organized) was the legal board, and that the election held by it was the legal election.

We do not think it makes any material difference whether said court house, or the south room of said court house, was, strictly speaking, the police judge's office or not, for all the people of the city of Anthony seem to have recognized it as the proper place for holding city elections. Nor do we think that it makes any material difference that the second board retired to the north room of the court house, for the voters, with one or two exceptions, came into the south room and voted from the south room. And evidently all the electors who voted, or offered to vote that day, knew of the existence of both boards. Besides, not only a large majority of all the voters who voted at that election, but a majority of all the voters residing in the city of Anthony, recognized the second board as the legal board, and intrusted their ballots with it. But was said second board legally organized? This is really the most serious question involved in the case. We think it was. Indeed, we think that either board was properly enough organized to be valid if the other board had not been organized, and yet neither was organized in strict conformity to law. *Both were organized too soon.* In strict law, no set

of "bystanders," or set of "electors present" at the voting-place on the day of election, has any right to elect the judges of the election until the hour of 8 o'clock in the morning of such day has arrived. (Comp. Laws 1879, § 6, p. 188, and § 3, p. 389.) Up to that hour it is reasonable to suppose that the regular judges of the election will make their appearance, and will take their places and hold the election. At least, up to that hour they have the right to do so. And if an organization is effected by the bystanders before that time has arrived, any subsequent appearance and offer to act by the regular judges of the election before 8 o'clock would certainly set aside such premature and untimely organization. But suppose that only one of the regular judges should so appear, which one of the judges elected by the bystanders should give place to him? That he would have the right to take the place of some one of such judges, cannot be questioned. Indeed, any election of judges of election before 8 o'clock in the morning can be at most only provisional; and judges so elected must give place to the regular judges, or to subsequently-elected judges, provided such regular judges, or subsequently-elected judges, appear and demand their places at any time before 8 o'clock in the morning. The bystanders or electors present at an election-place have no right even to vote for judges of the election until the hour of 8 o'clock in the morning shall have arrived. They may elect the judges and organize the board at any time after 8 o'clock in the morning, during the day, but they cannot legally do so before that time. But if they do, if they elect the judges before that time, then the most that can be said in their favor is, that the election of the judges will be treated as valid unless the regular judges subsequently appear at or before 8 o'clock, or another election of judges is had at or before that time. If a second election and second organization is had before 8 o'clock, (and that is this case,) then the first organization must give way to the second, and must be treated as invalid. And the second election, the second organization, and the second election board, will be deemed and held to be

legal and valid unless something else transpires to render it invalid. As before stated, there can be but one legal election board at the same time and for the same election precinct.

In the present case, the second organization has many advantages over the first. It was the last organization effected before 8 o'clock in the morning. About twice as many electors participated in effecting the second organization as in the first. A large majority of the electors present when the hour of 8 o'clock arrived (both boards being elected in the same room) were favorable to the second organization, and not to the first. More than twice as many votes were received by the second board as by the first. And a majority of all the legal voters of the city of Anthony recognized the second organization as the legal and valid one, and deposited their ballots with such second organization.

Judgment will be rendered in favor of the plaintiffs and against the defendants, and a peremptory writ of mandamus awarded.

HORTON, C. J., concurring.

BREWER, J., *dissenting:* I do not concur in the judgment in this case, and deem the matter of sufficient importance to express briefly the grounds of my dissent. I have no fault to find with the result in this particular case, for beyond question the second poll was recognized by a majority of the electors of Anthony as the legal poll, and by sustaining it the wish of the majority of her citizens as to their officers is established. Thus the result is in harmony with the great principle upon which our government rests, that the will of the majority is law. Still, the legality of a poll does not turn upon the number of electors who vote at it. It is legal or illegal when the taking of votes is commenced, and must be determined by the facts then existing. And the ground of my objection is, not in the result reached in this case, but in the rule in respect to elections which the opinion of the majority of this court announces. I think it dangerous, and fraught with peril. It will inevitably tend to the settling of disputes at the or-

ganization of election boards by double, triple or more polls, and the voter who shall come thereafter to cast his vote will have nothing to guide him, except, perhaps, the opinions and wishes of partisan bystanders, as to which is the legal board and at which his vote, if received, will count in the final result. I think it of primary importance that there should be but a single poll, that fraud and wrong will be more certainly guarded against by a single poll than in any other way, and that to that end the poll first organized should, except as modified in a manner to be hereafter indicated, be always regarded as the legal poll. No secession at any election should ever be tolerated. I agree that a poll organized prior to 8 o'clock is provisional only, and can be changed by a majority of the bystanders present at 8 o'clock. Both polls here were provisional only at first; both were organized before 8 o'clock. Now it seems to me most unwise to hold that the organization which, in point of time, comes nearest to 8 o'clock is the legal poll. We all know that watches vary. In this very case we have testimony from witnesses apparently credible, based upon an examination of watches at the time, varying the time of organizing these two polls all the way from 7:15 to 8 o'clock. As a fact, there is no absolute standard of time in most places. Is legality to turn upon a mere question of time under such an uncertainty as this? And how is the voter to settle this question of time? He may not have been present at the time of organization, and if he were, how can he be certain that his own watch will be found, upon the final inquiry, to have given him the true time? In this case, the majority of the electors voted at the second poll, and in this there was an implied recognition by the people. But suppose it were the other way, that, while the second poll was organized nearer to 8 o'clock and by a larger number of bystanders than the other, yet that a majority of the electors recognized and voted at the other poll: ought they to be disfranchised? Perhaps I can point out wherein I think my associates err better by stating how I think a poll should be organized, and then

noticing the departure made by those who organized the second poll. Of course, if all the regular judges are present, there is nothing for the bystanders to do. But if one or all of the judges are absent, the bystanders fill the places. This should never be attempted until 8 o'clock, because until that time there is no certainty that the regular judges will not act. To elect such judges as are to be elected, a provisional meeting is organized. Some one is chairman or president. He hears motions, puts questions, declares results and votes. If either regular judge is present, he is, by virtue of his office, the presiding officer of the meeting. But if all are absent, the presiding officer is elected and the meeting organized in the way so well understood by all. This meeting thus organized remains a legal meeting until 8 o'clock. All electors coming in up to that time have a right to participate in that meeting, to offer motions, make speeches and cast votes. Any judge elected by that meeting may be, by proper motion, set aside and a new judge elected at any time before 8 o'clock. But there can be but one legal meeting of the bystanders. That meeting must elect the judges, and in that meeting all electors must participate. And that meeting may legally organize before 8 o'clock. There is no warrant or right for any to organize a new meeting and elect judges. Such a proceeding will, I am confident, be found fraught with great peril in all elections, especially in large cities.

Now in this case they who organized the second poll went into the room where the first poll was being organized, and without attempting to take part with those there present and assist in organizing that poll, called a second meeting in a different part of the room and started an entirely independent organization. Their duty, as I conceive, was to take part in the meeting already existing, to make their motions and offer their resolutions, and if, as they claim, they constituted a majority of those in the room, they would have outvoted their opponents and carried their motions. There is not the slightest thing to indicate that if any bystander had offered

21—24 KAS.

a motion of any kind, even to change a judge already de-
clared elected, such motion would not have been entertained
and the result declared upon the majority of the votes cast
and accepted by all as conclusive, and thus all excuse for. a
second poll would have been obviated. But as the testimony
abundantly shows, the second party coming in entirely ig-
nored what had been done, ignored the meeting already ex-
isting and made no effort to take part in that, but declaring
that all done was premature, they, themselves acting prema-
turely, started a new meeting and a new organization. And
such departure is sustained by this court.

I have mentioned one objection to this, that the voter com-
ing through the day has little to guide him in selecting the
true and legal poll. I may mention another, and that is, that
the friends of each poll, resting in the legality of that poll,
will pay little attention to the other, and hence multitudes of
illegal votes may be cast at a poll which a subsequent compar-
ison of time-pieces will compel the courts to sustain as the
only legal poll. All this would be obviated by compelling
all bystanders to take part in the meeting first organized.

I have not noticed two matters which may sometimes affect
particular cases. The doctrine that the first meeting must be
held the legal meeting, is of course limited to this, that it
must not be organized so early as to be manifestly fraudulent.
Eight o'clock is the hour, and an organization may be at-
tempted so much before this as to be manifestly fraudulent.
Here, friends of both sides were present at the time of the
commencement of the organization of the first poll, and it
would not seem that the meeting was so early as to be ad-
judged fraudulent. Again, if they who come in before 8
o'clock are refused participation in the meeting already exist-
ing, there may be cases in which the wrong is so great as to
justify a secession. But nothing of that kind appears here,
and the court sustains the legality of the second board upon
the theory that its organization, though confessedly premature,
was less so than the other and nearer in point of time to 8
o'clock. I think that a singleness of poll is more important

than the matter of time, and that whatever of special hardship there may be in this case, had better be sustained than to hold out before any faction the possibility of securing recognition of its separate poll by making its organization hit the hour of 8 o'clock more closely than any other.

For these reasons, thus briefly stated, I dissent.